

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-23-00095-CV

———————————————————

DEBBIE PERALES, ROBIN HAWKINS, SUZANNE LEOS, CRYSTAL CHAVEZ, JILL HIATT, URSULA CUI, SHAWNA GOFFNEY, AMBER MCMILLAN, LARAMIE RIVERA, AND LUIS TROCHEZ, Appellants

V.

KRISTIN NEWMAN, Appellee

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-334149-22

Before Sudderth, C.J.; Bassel and Walker, JJ.
Memorandum Opinion by Justice Bassel

**MEMORANDUM OPINION**

## I. Introduction

Appellee Kristin Newman sued Northeast Tarrant Little Miss Kickball, Inc. (Kickball), a nonprofit corporation, and Kickball's directors and officers—Appellants Debbie Perales, Robin Hawkins, Suzanne Leos, Crystal Chavez, Jill Hiatt, Ursula Cui, Shawna Goffney, Amber McMillan, Laramie Rivera, and Luis Trochez—after her allegedly improper removal from Kickball's board of directors, membership, and All Star team coaching position. Appellants sought dismissal of Newman's lawsuit under the Texas Citizens Participation Act (TCPA).[1] *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001–.011.[2] Their TCPA motions were overruled by operation of law. *See id.* §§ 27.005(a), .008(a).

In a single issue in this accelerated interlocutory appeal, *see id.* §§ 27.008(b), 51.014(a)(12), Appellants argue that they were entitled to a TCPA dismissal of Newman's claims against them. We disagree. Because Appellants have failed to show that the TCPA applies to Newman's claims, we overrule their sole issue and affirm the denial of their motions.

---

[1]Kickball did not file a TCPA motion and is not a party to this appeal.

[2]In 2019, the Legislature made significant amendments to the TCPA, and those amendments apply to actions like this one filed on or after September 1, 2019. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, § 11, 2019 Tex. Gen. Laws 684, 687 (amended 2021, 2023) (codified at Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001–.011).

## II.  Background

We begin with a review of Newman's factual allegations and claims, followed by a summary of the parties' motions and responses.

### A.  Newman's factual allegations in her original and amended petitions[3]

Kickball and Little Miss Kickball International, Inc. (LMKII), of which Kickball is a chapter, are Texas nonprofit corporations that govern an organized youth sports league.  Kickball, which has operated for over thirty years, incorporated in 2005.  Kickball's members are "parents and guardians of players, officers, directors[,] and persons 'showing an active interest' in kickball as a past or present volunteer—including coaches, umpires[,] and groundskeepers."  Kickball's members elect its board of directors at the annual meeting, held during the season's Closing Ceremonies, when the board is then announced to Kickball's membership.

Newman grew up as a Kickball player, and since 2008, she had "consistently volunteered with [Kickball] in various capacities," including as a coach, umpire, and director.  For over two decades, Newman and her family "played a large role" in the league's management, operation, and growth.

---

[3]Newman objected to the timeliness of one of the TCPA motions. *See generally* Tex. Civ. Prac. & Rem. Code Ann. § 27.003(b) (stating TCPA's sixty-day filing period); *Montelongo v. Abrea*, 622 S.W.3d 290, 293–94 (Tex. 2021) (addressing renewal of sixty-day period for amended pleadings that add a new party, fact, or claim). Because the TCPA does not apply to Newman's claims, for purposes of our analysis, we assume, without deciding, that the TCPA motions were timely and do not address the timeliness complaint. *See* Tex. R. App. P. 47.1.

Newman served on Kickball's 2022 election committee, which decided to supplement low in-person voter turnout by incorporating online voting using Survey Monkey. Using Survey Monkey, a "unique link" was to be emailed to each member for absentee voting. If the member did not use the link, then he or she could still vote in person at the June 4, 2022 Closing Ceremonies. The committee decided to close online voting at 11:59 p.m. on Thursday, June 2, and tally the results on June 4 after in-person voting ended.

The committee made Newman the Survey Monkey account administrator. Newman claimed that the committee's only direction to her in that role was that she not access Survey Monkey until after electronic voting ended on June 2. Newman alleged that she had abided by that instruction, did not access Survey Monkey until June 3, and then accessed it to prevent duplicate in-person voting by closing the links of those who had not yet voted. Newman alleged that she told Perales (Kickball's President) and other board members about these actions but that no one seemed concerned until Chavez (Kickball's League Coach) and Hawkins (Kickball's Vice President) were not reelected to the board of directors.

During Closing Ceremonies, Perales announced the 2023 board, which included Newman as both the new League Coach and one of the Kickball All Star coaches for a team going to the June 30–July 3 All Star Tournament. Perales subsequently called a "special meeting" of the board to remove Newman and another board member from the board and membership, but she called the meeting for

4

Sunday, June 26, a date on which Perales "had actual knowledge and awareness that [Newman] would be out of state[] and not available to attend."

As to the election, in both her original and amended petitions, Newman referenced a Kickball bylaw that "[t]he nominee with the highest vote count at the time of the Annual Meeting of Members will be elected to each position," and she claimed that Kickball's bylaws contained no other provisions for an election review or contest. Newman further stated that Kickball's bylaws had two grounds by which a board member could be removed: (1) failure to attend three consecutive regular meetings without written or oral excuse; and/or (2) "display[ing] conduct considered to be inconsistent with the purpose of . . . Kickball[] or . . . the duties and responsibilities for which the office was intended." Newman asserted that she had committed no act that would fall under either provision.

## B. Newman's claims

Newman initially sued Kickball and its officers—Perales, Hawkins, Chavez, and Leos (Kickball's Secretary)—in their individual and official capacities (collectively, the Original Defendants) and brought claims for declaratory judgment and for ultra vires acts. Newman amended her petition to add more Kickball directors in their official and individual capacities—Hiatt (Treasurer), Cui (Head Scorekeeper), Goffney (Advertising), McMillan (Uniforms and Trophies), Rivera (Team Mom Coordinator),

5

and Trochez (Information Technology).[4]  In her amended petition, Newman added claims for breach of fiduciary duty, conspiracy, negligence, fraud, and inspection of books and records and an accounting, as well as two new declaratory-judgment requests and requests for monetary relief, including exemplary and mental-anguish damages and disgorgement.

### 1. Declaratory judgment—original and additional requests

In her original petition, Newman sought a declaratory judgment that the June 4 election results were final, that a failure to accept the election results would constitute an ultra vires act, that the failure to produce records she had requested violated the Texas Nonprofit Corporations Act, that the arbitrary and capricious removal of coaching staff violated Kickball's bylaws, and that she had not violated any of Kickball's or LMKII's rules that would give rise to her removal as a Kickball member or director.[5]  In her amended petition, Newman applied these requests to all of the defendants and requested two additional declarations: that each individually named defendant had breached a fiduciary duty to Kickball and that one or more of the

---

[4]We refer to this group of defendants—except for Hiatt, who filed a separate TCPA motion—collectively as the New Defendants.

[5]Newman also sought in her original petition a temporary restraining order (TRO) and temporary injunctive relief to prevent her removal from various positions as well as to prevent the Original Defendants' interference with those positions, to prevent them from depriving her of notice of meetings, and to prevent them from altering, changing, or voiding the June 4, 2022 election results.  In her amended petition, Newman abandoned her TRO request but continued to seek the same injunctive relief.

individually named defendants had used their positions as officers or directors for personal gain or profit.

## 2. "Ultra vires"—original and amended claims

In her original and amended petitions, Newman complained that all of the defendants had violated Texas Business Organizations Code Chapter 22 "when they purported to remove certain people as members and . . . [d]irectors of [Kickball]." She alleged that Chavez and Hawkins had been unhappy with the election results and that the defendants had conspired to find ways to disregard or change the election results to maintain Chavez's and Hawkins's board positions. She also alleged that the defendants had collectively engaged in a civil conspiracy to undo the election, change the election results, and banish her from participating as a member and volunteer based on her alleged commission of voter fraud.

Newman asserted that all the defendants had

collectively accused [her] of taking "actions . . . outside of the agreed upon [election] process . . . without consent or informing the Elections committee of such activities" and ha[d], somehow, parlayed that into grounds to remove [her] as an All Star Coach for 2022, to remove her as a member of the current Board of Directors, and to change the outcome of the elections to remove her from serving as a Board member for 2023.

Newman further complained that Hawkins, Leos, and Chavez had—contrary to Kickball's bylaws—met in a clandestine, unannounced meeting to conspire to remove her from being an All Star Coach and that Hawkins and Perales, in their official capacities, had announced that she had been removed as an All Star Coach.

7

Newman also alleged that on May 14 and May 18, she had properly requested the league's membership list in accordance with the Texas Nonprofit Corporations Act, a request ignored by the defendants, and that on June 13 and June 14, she had repeated her request and had added a request to inspect and copy league records, both of which were ignored. She stated that Leos, as league secretary, had a duty to respond to those requests but had ignored them and that Leos had also failed to maintain the membership list as required by law and had refused to make it available before the June 4 annual meeting.

Newman further alleged ultra vires acts by the defendants, "individually and collectively, in conspiracy with one another," in the form of breaches of fiduciary duty to Kickball based on their having acted beyond the scope of their powers granted in Kickball's governing documents, based on self-dealing, and based on the lack of diligent and prudent management of Kickball's affairs. She complained that the defendants had deviated from acting in good faith and had allowed their personal interests to prevail over Kickball's interests by (1) making false accusations; (2) changing the "process," "directions," or "instructions" they claimed they made to Newman regarding voting; (3) violating Kickball's bylaws through illegally conducting clandestine meetings; and (4) unilaterally changing Kickball's membership and voting-eligibility rules "solely to suit their interests."[6]

---

[6]Kickball and the Original Defendants filed an unsuccessful Rule 91a motion on Newman's original petition before the Original Defendants filed their TCPA

### 3. Breach-of-fiduciary-duty claims

In her amended petition, Newman added two breach-of-fiduciary-duty claims—one of which set forth allegations very similar to the ones supporting her ultra vires and declaratory-judgment claims: duties owed to Kickball as directors and officers; a civil conspiracy based on defendants' "personal vendetta against [her], by taking actions to remove her" as a member and director through, among other things, setting aside the first election and restricting voting in the second; passing a one-time special bylaw to invalidate the 2022 election results and hold a new election to make sure she and her mother Robin[7] would not be elected for the 2022–2023 term because their names were omitted from the ballot; and failing and refusing to deliver membership lists despite lawful requests. Newman alleged that Perales, Hawkins, and Leos were members of the election committee that had authorized electronic voting

motion. *See* Tex. R. Civ. P. 91a. In their Rule 91a motion, they argued that Newman had no legitimate claims against them, that the bylaws permitted their alleged actions, and that Newman had included "grossly" misleading factual allegations. In her response, Newman pointed out, among other things, that the motion relied on evidence outside the pleadings. She argued that the movants had to establish that her claims were foreclosed as a matter of law or that her factual allegations had defeated her claims. *See City of Dallas v. Sanchez*, 494 S.W.3d 722, 724–25 (Tex. 2016) (noting that a Rule 91a dismissal is analogous to a plea to the jurisdiction, requiring a court to determine whether the pleadings allege facts showing jurisdiction). The trial court denied the motion and ordered the Original Defendants and Kickball to pay attorney's fees to Newman. *See* Tex. R. Civ. P. 91a.7 (stating that except in an action by or against a governmental entity or a public official acting in his or her official capacity or under color of law, the court may award costs and reasonable attorney's fees to a Rule 91a motion's prevailing party).

[7]Because Newman and her mother share the same last name, we will refer to her mother by her first name.

but were unhappy with the results when Newman and Robin were elected in lieu of two incumbent directors, and that the defendants took no action against Perales, Hawkins, and Leos despite their election-committee participation. Newman alleged that the defendants had violated their fiduciary duties to Kickball and had engaged in actions "solely for personal gain, personal interest[,] and personal profit."

In her separate breach-of-fiduciary-duty claim as to Perales, Newman alleged that Perales had reserved hotel rooms for other Kickball members and their families to attend out-of-town tournaments and, while each member was obligated to pay for his or her hotel room, Perales "ensured that she, personally, received all of the hotel rewards points in her name" and "refused to allow the members or [Kickball] to earn and receive their own hotel points, when requested." Within this claim, Newman also alleged a civil conspiracy between Perales and the other defendants to allow Perales to personally profit from her photography services to the league in a no-bid situation, i.e., another civil conspiracy to commit breach of fiduciary duty.

#### 4. Fraud

Newman brought a fraud claim in her amended petition. Because the 2019 TCPA does not apply to a common law fraud claim, we do not address it. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.010(a)(12).

#### 5. Negligence

In her amended petition, Newman alleged that each defendant, as a director, was obligated to discharge duties to Kickball in good faith, with ordinary care, and in

10

a manner he or she reasonably believed to be in Kickball's best interest. She claimed that the defendants negligently breached their fiduciary duties by,

> among other things[,] (1) altering the Bylaws to allow them to perform a second election using the same or similar process that [they] claimed was illegitimate; (2) conducting a second election with only a fraction of the number of ballots issued in the first election—allowing only a select few to vote in the second election; and (3) omitting [Newman's] and [Robin's] name[s] from the second ballot, to ensure that [the defendants'] personal goals would be achieved.

Newman contended that, in the alternative, the defendants had a duty to confirm the first election's legitimacy and to question the second election's legitimacy and to act in good faith and with ordinary care in conducting such important corporate business but breached that duty, complaining that

> [a] reasonable and prudent Director would have reasonably questioned the integrity of the second election. Instead, the Defendants decided to fabricate violations and anomalies in reviewing the outcome of the first election; thereafter, Defendants conspired together to change the Bylaws to allow themselves the right to conduct a second election, to ensure their personal agenda, goals, and outcome was met.

Newman claimed that the defendants' acts constituted negligence that was both the cause in fact and proximate cause of her damages.

### 6. Civil conspiracy

In her amended petition, Newman alleged that all the individual defendants had engaged in a civil conspiracy to deprive her of her rights as a Kickball member and director, contrary to LMKII's rules. She claimed that the defendants sought to accomplish an unlawful purpose of disregarding the existing bylaws and June 2022

election results or, alternatively, sought to accomplish the lawful purpose of voting in a new board of directors by the unlawful means of using their majority vote, in derogation of their fiduciary duties, to alter and change the bylaws and the June 2022 election results. She complained that the defendants accused her and Robin of violating the bylaws as a basis to remove them but ignored the same violations committed by Perales, Hawkins, Leos, and other board members. She alleged,

> The Defendants have "temporarily" changed the Bylaws to suit their personal interests, they have improperly conducted a second election for 2022, . . . they have deprived members of their right to vote according to the Bylaws[,] and they have improperly and unlawfully altered and changed the 2022 ballot by removing [Newman] and Robin . . . from the names of the nominees.

### 7. Inspection of books and records and an accounting

In her amended petition, Newman complained that she had previously requested the right to inspect Kickball's books and records under Business Organizations Code Section 22.351 but had been ignored by the defendants, who had failed to respond on a timely basis. She renewed her demand "as such information is pertinent to the issues of mismanagement of corporate funds[] and is relevant to the elections process." Newman also sought an accounting of Kickball's funds paid to the defendants over the preceding five years and an accounting of "all hotel points, or other reward or compensation, or anything of value" received by Perales in connection with the booking and hotel reservations that she had made for Kickball members over the preceding five years. And Newman sought an accounting by

12

Perales "for all funds she received over the preceding five years through her [Kickball] positions . . . and through her photography services provided to [Kickball] and its members."[8]

## C. TCPA filings

The Original Defendants filed a TCPA motion, and the New Defendants joined it and incorporated it by reference, while Hiatt filed her own. Not long into the hearing on the first TCPA motion, the trial court reset a hearing on all the TCPA motions[9] and ordered the parties to file amended motions, responses, and replies.[10]

---

[8]Appellants raised a variety of defenses in their answers, including the business judgment rule, justification, lack of standing, lack of capacity, and the barring of Newman's claims by Business Organizations Code Sections 22.221(b), 22.228, and 22.235(a). Because—as set out below—we do not reach the second or third steps of the TCPA burden-shifting process, we address only the standing complaint. *See McLane Champions, LLC v. Hous. Baseball Partners LLC*, No. 21-0641, 2023 WL 4306378, at *3 (Tex. June 30, 2023); *see also* Tex. R. App. P. 47.1.

[9]The trial court granted the Original Defendants' motion to take judicial notice that docket conditions required a hearing outside the statutory sixty-day window. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.004.

[10]The trial court's order reflects its aggravation during the initial TCPA hearing with the participants' failure to follow the trial court's rules. The Original Defendants attached 246 pages of exhibits to their TCPA motion. Newman objected to those exhibits in the first eighty-seven pages of her 115-page response. The trial court set page limits on the parties' filings and ordered the parties to "[o]nly put in an exhibit [w]hat [the judge] actually need[ed] to read." Because the trial court ordered the parties to amend their filings and they did so, we do not consider the original TCPA motions' arguments and evidence. *See* Tex. R. Civ. P. 62 (distinguishing amendment from supplement); *see also Diep Tuyet Vo v. Vu*, No. 02-15-00188-CV, 2016 WL 2841286, at *3 n.14 (Tex. App.—Fort Worth May 12, 2016, no pet.) (mem. op.) (stating that an amended motion supplants and replaces an initial motion); *State v. Seventeen Thousand & No/100 Dollars U.S. Currency*, 809 S.W.2d 637, 639 (Tex. App.—

### 1. Amended TCPA motion #1

In the amended motion, the Original (and New)[11] Defendants claimed that Kickball had partnered with the City of Watauga to use the City's playing fields in exchange for field maintenance. They asserted that Newman's claims stemmed from Kickball's removal of her as a director and Kickball's refusal to allow her to coach children. They contended that Newman had been caught "manipulating election results" and that this was the basis for "kicking [her] out of Kickball." They claimed that because of Newman's actions, LMKII removed the directorship election from Kickball's control and conducted a second election. They also asserted that Newman had a 25% player retention rate (in comparison to the average 60–90%) and had conceded in her coaching application that her "yelling to get the attention of the girls on the field c[ould] be seen as too intense," or as they characterized it, "abusive."

They complained that Newman was misusing the court "as a stage for her petulance, filing meritless claims to hinder [their] freedom of association" and freedom of speech and contended that most of her claims failed as a matter of law because she lacked standing; that some of her other claims were mooted by the

Corpus Christi–Edinburg 1991, no writ) (stating that a substituted or amended motion supercedes and supplants the previous motion, "which may no longer be considered").

[11]The record does not reflect that the New Defendants expressly adopted the Original Defendants' amended TCPA motion or Hiatt's amended TCPA motion. We will nonetheless assume, without deciding, that they did so based on their appearance and argument at the subsequent hearing and their collective arguments on appeal.

subsequent election; and that all of her claims lacked the clear and specific evidentiary support required to defeat their TCPA motion. They argued that all of Newman's claims were based on their communications to other members and to the public regarding the Kickball election and their conduct as board members, arguing that "the operation of a nonprofit community youth sports league that operates in a public-private partnership with the City of Watauga is a matter of public concern."

The amended motion contained the following exhibits: *Fort Worth Star-Telegram* articles about the sport dated June 30, 1991; April 13, 1996; July 7, 1999; January 24, 2000; January 26, 2000; and June 11, 2000; Kickball's 2005 articles of incorporation, which referenced various portions of the bylaws; Newman's All Star coaching application in which she mentioned her "yelling to get the attention of the girls on the field can be seen as too intense"; a single page of Kickball's bylaws, which set out the organization's name, history, location, and purpose but not whether a member could sue on Kickball's behalf;[12] and unsworn declarations by Chavez[13] and Hawkins.[14] *See*

---

[12]Article I, section 2 of the bylaws stated that the league's fields "are currently located at Foster Village Park . . . in Watauga" and that "Foster Village Park is owned by the City of Watauga and administered by the Watauga Parks Development Corporation."

[13]In her unsworn declaration, Chavez stated that the City of Watauga leased fields in Foster Village Park to Kickball each season.

[14]Newman argues that we should not consider Hawkins's and Chavez's unsworn declarations in this appeal. However, the record does not reflect that the trial court ruled on her objections to this evidence, and—in any event—the

15

Tex. Civ. Prac. & Rem. Code Ann. § 132.001(a) (stating that generally an unsworn declaration may be used in lieu of an affidavit "required by statute or required by a rule, order, or requirement adopted as provided by law"); Tex. R. Civ. P. 166a(c), (f).

Hawkins stated in her unsworn declaration that in May 2022, Newman was outraged when Perales and Chavez were selected as 2022 All Star head coaches instead of Newman and Robin. Hawkins stated that after Newman and Robin were not selected, Newman "became disengaged and discourteous" and failed to appear at a May 17, 2022 scheduled game without notice to her players and their families. Hawkins also stated that on June 4, 2022, Perales sent the election committee a message that all election data needed to be preserved because she had discovered discrepancies in the Survey Monkey reports and that an executive committee meeting was held on June 6 with Perales, Chavez, Hiatt, Leos, Robin, and Hawkins in attendance to discuss the discrepancies. When Hiatt and Leos agreed to conduct an audit, Robin told the executive committee that Newman had already deleted the Survey Monkey data.

Hawkins stated that at a June 12 board meeting, held to provide an update on the election's status, Perales announced that she was going to request Newman's and Robin's removal as members and board members based on their election-related actions, and Newman announced that she would be requesting the same as to Perales.

admissibility, relevance, and reliability of this evidence is not dispositive of the appeal. *See* Tex. R. App. P. 33.1, 47.1.

16

A special meeting was scheduled for June 26 to vote on the removal motions. At the June 26 meeting, the motion to remove Newman and Robin was carried by a roughly two-thirds vote, but Newman's sister's motion to remove Perales was not seconded. On August 2, the board met and agreed to redo the election, to be conducted by LMKII, because they were not able to review the first election.

## 2. Amended TCPA motion #2

In her amended motion, Hiatt sought dismissal of all of Newman's claims except for fraud, which she acknowledged was excluded from the TCPA. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.010(a)(12). She otherwise incorporated the other amended TCPA motion. Hiatt attached to her amended TCPA motion Hawkins's unsworn declaration, summarized above, as well as a series of emails between Newman and other parties and Hiatt's own unsworn declaration.

In a May 4, 2022 group email to Newman in which, among others, Perales, Robin, Leos, and someone with the alias "NETLMK" were copied, Hawkins told Newman, as to some of Newman's comments about the bylaws, that she "d[id]n't mean to seem ungrateful but it really would have been awesome if [Newman] would have been motivated to dig into this last October when the Bylaws Committee reached out to the [board of directors] for input." Hawkins also told Newman, "[U]nfortunately the 2023 Bylaws Committee will have to take up the task of making the permanent updates[;] maybe you can volunteer for that :) Ha!"

17

Newman replied that she had had no reason to delve into the Nonprofit Corporations Act "before recent client obligations" and stated, "I guess I should not have assumed our bylaws were legally compliant." In the same email, Newman told Perales, "If you believe that bylaw adequately abides by the Act by excluding some members to vote, that is up to you. However, I strongly recommend you reevaluate that thought as unilaterally precluding some voting members is rarely looked well upon by courts."

Hiatt also attached a series of May 31, 2022 emails exchanged between Newman, Robin, Perales, Leos, and NETLMK about a link to vote that had been "forwarded to a voter outside the guidelines [they had] agreed upon" and the need to quickly schedule an election committee meeting to address the situation. The controversy arose because it appeared that a member had been sent a link to vote via text. The emails show the election committee's debate about the implementation of their agreed-upon procedures but do not clarify the disputes that Newman raises in her petition about actions taken after the election. Hiatt also attached a June 3, 2022 email from Perales to Newman, Robin, Hawkins, and Leos about the voting links and the procedure they would use on June 4.

Hiatt attached a series of emails exchanged on June 7, which began with Leos's asking Newman if she had a recommendation to resolve the election issues, followed by Newman's response:

There aren't many options available. [Perales's] proposed options go beyond the scope and authority provided to the Board by our bylaws. Our bylaws require us to accept the votes as they stand at Closing Ceremonies (i[.]e[.,] our annual meeting of the members). We cannot in good faith "write in" or presuppose a provision in the bylaws to validate, certify, or audit votes. As I have said before, we must revise our bylaws and, at which time, we can add a clause allowing such validation of votes. My suggestion is to move forward with the votes as announced at Closing Ceremonies and make changes next year. Any other option violates our bylaws.

Perales then replied,

Our current bylaws also do not mention online voting as a means to collect votes but we did.

This is the first time we have attempted to do online voting so we must confirm without a doubt the legitimacy of the process especially if we plan to continue using this method as a means to collect votes.

Newman responded,

To be clear: our bylaws state we can collect votes via any method we decide. We decided/agreed that online voting was a legitimate form to collect votes prior to the ballots ever going out.

Determining the legitimacy of the type of voting format/process is very different than determining the legitimacy of the votes received—which seems to be what is happening now and that is outside of the authority provided by our bylaws.

Hiatt also attached two June 9 emails. The first was from Hiatt to Newman, copying Perales, Leos, Robin, and two others. Hiatt stated,

We would really like to get this resolved before the board meeting on Sunday. Nothing is mentioned in the by[]laws, but basic, logical democratic policies have recounts if there are questionable results. I don't see the problem in just doing an audit on the ones that show as changed.

[Newman], can we just see if we can get the survey resurrected so we can confirm everything? We haven't used Surveymonkey before and we just want to confirm that the results were accurate since [Perales] did find anomalies and the agreed-upon process wasn't followed to the T. Technology is great, but it isn't perfect. It would be wrong if we, as a board, didn't verify all of the data if we see errors. That is our job to ensure that we are doing the best we can to represent our peers.

The second was Newman's response to Hiatt, copying Perales, Leos, Robin, and two others, and stating that she was forwarding her June 7 email exchange with Survey Monkey "to ensure there was no question whether [she was] providing false information about the capabilities any kind of audit would have." Newman stated,

> With respect to the first part of your question, I am still in talks with Survey Monkey regarding "resurrect[ing]" the survey data. I will let you know as soon as possible what their response is. As you can see below, I asked whether there was a way to see if responses were changed and if so[,] what the prior responses were. Meghan, with Survey Monkey customer service[,] responded with, "[A]t this time it's not possible to see if responses had been changed or what their previous response would have been."

> Accordingly, while there may have been anomalies with some timestamps, those anomalies prove nothing with respect to the accuracy of the responses themselves. Because, as Meghan confirmed, there is no way to see if responses have been changed, there is no way to prove the opposite (i.e., there is no way to verify the responses we reported were incorrect). An audit neither is permitted nor will provide you with the answers you seek.

> As I previously stated, as a Board we are required to accept the votes as they stand at Closing Ceremonies (i.e., our annual meeting of the members). If my above explanation and prior suggestion is not sufficient, I'm happy to invite a LMK Corporate representative, as well as an attorney with 40 years of corporate law experience, to our Board meeting on Sunday to explain the repercussions of moving forward with any other options.

We all want what is best for this league. At this point, it seems our definitions of "best for this league" are vastly different. Continuing on with this investigation not only is futile but also simply allows more drama and animosity to carry on.

Hiatt attached her unsworn declaration in which she stated that on June 4, she told Perales that Zach V. had voted in person, and Perales told her that Zach V. had registered an online vote. When Hiatt asked Zach V. if he had voted online, he told her that he had not and that the email address that Kickball had listed for him was not an address that he currently used. At the June 6 executive-committee meeting, Hiatt voiced her observation about Zach V.'s statements, and Perales presented other issues, including that Newman's report had not matched the Survey Monkey direct download, that votes had come in after the links were closed, and that there were time-stamp changes. Hiatt stated that she had proposed an audit and review of the election and that everyone "agreed it would be good to validate the information to ensure its accuracy, since it was the first time that [Kickball had] used Survey Monkey."

Hiatt stated that at that point, Robin told them that Newman had "deleted the Survey Monkey immediately after closing day." Hiatt reviewed the Survey Monkey retention rules, which stated that information was permanently deleted "after sixty days." Hiatt stated that she had voted for the removal of Newman and Robin based on their refusal to provide the deleted Survey Monkey data, as well as "their history of conflict with other board members and their lack of candor."

21

### 3. Newman's amended TCPA response

Newman argued that the TCPA did not apply because her lawsuit did not involve slander or defamation claims and related not to speech but to actions.[15] To her response, she attached her unsworn declaration, in which she stated that the bylaws required a three-quarters vote, not a two-thirds vote, making the votes insufficient to remove her. She also stated that Kickball's board had amended the bylaws to disregard the 2022 election results and had held a second election without her name on the ballot that was conducted by email only and sent "to a fraction" of the Kickball membership. She stated that she did not change any of the Survey Monkey data or results and that Hawkins was the only person who assigned Survey Monkey hyperlinks and sent them to members. And she stated that the City of Watauga–Kickball lease agreement "is only an agreement to use the ball fields, on a year-by-year basis," during the regular Kickball season in exchange for monetary consideration to the City and does not include any mutuality of interest between Kickball and the City for the league's operation, any agreement to share profits or losses generated by the league's operation, or any input by the City as to the league's operation and management other than to require Kickball "to abide by the rules,

---

[15]Newman raised a variety of objections to the exhibits attached to the TCPA motions, including that the *Star-Telegram* articles were inadmissible and irrelevant because they predated Kickball's existence and did not relate to her or the defendants. As noted above, the trial court did not expressly rule on any of Newman's objections. *See* Tex. R. App. P. 33.1.

regulations and ordinances established by the City of Watauga, as they may relate to the city park, in general."

Newman stated in her unsworn declaration that some Kickball parents told her that Perales had assumed the role of "League Photographer" to take player and team photos, that Perales had charged an excessive amount for that service, and that some of the parents had not yet received their paid-for photos. She also stated,

> I was also told by parents that attended the All Star Tournament that . . . Perales booked the hotel rooms under her name so that she would receive all of the hotel points for the rooms paid for by the parents, and that she would not allow the parents to claim their own hotel reward points, even though the parents were paying for their own rooms.

Newman attached her sister Lindsey's unsworn declaration, in which Lindsey stated that she had attended the June 26, 2022 meeting at which there was "a 2/3 vote in favor of removing [Newman] as a director and as a member." Newman attached her counsel's unsworn declaration in support of $20,825 in attorney's fees.

### 4. TCPA reply

In their reply, the Original Defendants argued that they had shown that Newman's suit was in response to TCPA-protected communications on matters of public concern. In support of their argument, they referenced the "public interest arising from youth sports organizations playing on community fields and interacting with, caring for, and developing the children of the community," the "unique overlay of [Newman's] manipulating electronic election results and her mother seizing paper ballots" to ensure Newman's placement as an All Star coach, and Newman's having

23

been terminated "as a coach because she was yelling at children." They referenced a pre-2019 TCPA case, *Bilbrey v. Williams*, No. 02-13-00332-CV, 2015 WL 1120921 (Tex. App.—Fort Worth Mar. 12, 2015, no pet.) (mem. op.), regarding coaching behavior[16] and addressed their characterization of Newman's claims.

## D. TCPA hearing and ruling

At the hearing's resumption, the Original Defendants' counsel argued that Newman's petition presented a matter of public concern because (1) it involved a youth sports organization "working in concert with the City of Watauga, using their fields in exchange for maintaining the fields"; (2) "the complaints have an overlay . . .

---

[16]*Bilbrey* was decided under the 2011 TCPA. 2015 WL 1120921, at *1. Williams, an assistant coach of the same children's baseball team as Bilbrey, the head coach, sued Bilbrey for defamation and Chuck Hall, the league's president, for related claims based on statements Bilbrey made to Hall about Williams's behavior (allegedly yelling at teenage umpires). *Id.* at *1, *3. After the trial court denied Hall's and Bilbrey's TCPA motions, they prevailed on appeal because under the 2011 TCPA, Williams's lawsuit was based on statements Bilbrey made on a matter involving the well-being and safety of children in the community, making the statements matters of public concern and based on and arising out of the right of free speech. *Id.* at *9.

Under the 2019 TCPA, the statutory "matter of public concern" does not "categorically include all statements or activities relating to child welfare within its ambit." *Morris v. Daniel*, 615 S.W.3d 571, 578 (Tex. App.—Houston [1st Dist.] 2020, no pet.). Instead, the 2019 TCPA defines "matter of public concern" to mean a statement or activity regarding a public official, a "matter of political, social, or other interest to the community," or a subject of concern to the public. Tex. Civ. Prac. & Rem. Code Ann. § 27.001(7)(A)–(C). *Cf.* Act of May 18, 2011, 82d Leg., R.S., ch. 341, § 2, 2011 Tex. Gen. Laws 961, 962 (amended 2019) (defining "matter of public concern" to include an issue related to health or safety; environmental, economic, or community well-being; the government; a public official or public figure; or a good, product, or service in the marketplace). Further, none of Newman's claims are related to her coaching behavior.

24

of election shenanigans"; and (3) it involved Newman's coaching status. He also argued that the Original Defendants, as directors, had statutory immunity.

Hiatt's counsel stated that her evidence highlighted "emails back and forth between . . . Hiatt and . . . Newman making very clear that this nonprofit had a dispute on how to do an election." The New Defendants' counsel argued that his "client group [was] even one step further removed from the other defendants in the case" and were "simply members of the board that voted in two elections." He added, "There [were] no communications between my clients and [Newman,]" and all his clients did was "vote[] in an election."

Newman's counsel responded that there was "a big difference between saying and doing." He argued, "[T]here's been no evidence as to what [the TCPA] communication is and whether or not this lawsuit relates to a communication," and he contended that the case, which was not defamation based, had nothing to do with protecting First Amendment rights.

The motions were overruled by operation of law. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.005(a), .008(a).

## III. Discussion

Appellants argue that they were entitled to dismissal, asserting in part of their sole issue that the TCPA applies to Newman's claims and that Newman lacks standing. Newman responds that Appellants failed to show the TCPA applied and

25

that she sufficiently alleged standing in her pleadings and supported it with her unsworn declaration.

Based on *McLane Champions*, we must address the standing question first. *See* 2023 WL 4306378, at *3 ("Because standing is a threshold jurisdictional issue that is essential to a court's power to decide a case, we address that issue before turning to the substance of the TCPA motion." (internal quotation marks omitted)); *Buzbee v. Clear Channel Outdoor, LLC*, 616 S.W.3d 14, 22 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (explaining that a court should and must consider standing when raised in the context of a TCPA motion but not by using the TCPA burden-shifting mechanism, which is "ill-suited for resolving whether a court is authorized to decide a controversy" because a TCPA motion is a procedural vehicle to address a claim's merits and not the propriety of a jurisdictional-defect-based dismissal).

## A. Standing

In *McLane Champions*, the supreme court considered standing in a TCPA case because the lack of constitutional standing deprives a court of subject-matter jurisdiction. 2023 WL 4306378, at *3. To show constitutional standing, a plaintiff must show that (1) she suffered a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable decision is likely to redress the injury. *Id.*

The *McLane Champions* plaintiff alleged a textbook "pocketbook injury," including that it paid a bloated purchase price in reliance on the defendant's material

26

misrepresentations. *Id.* The plaintiff's assignment of its rights under the purchase agreement did not implicate standing in a jurisdictional sense because "a plaintiff does not lack standing simply because some other legal principle may prevent it from prevailing on the merits; rather, a plaintiff lacks standing if its claim of injury is too slight for a court to afford redress." *Id.* at *4 (quoting *Data Foundry, Inc. v. City of Austin*, 620 S.W.3d 692, 696 (Tex. 2021)).

According to *McLane Champions*, a plaintiff has standing when she is personally aggrieved, regardless of whether she is acting with legal authority; in contrast, she has capacity when she has the legal authority to act, regardless of whether she has a justiciable interest in the controversy. *See id.* (citing *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 778 (Tex. 2020)). The court noted that the assignment might affect the plaintiff's ability to recover damages (capacity), but it did not affect the plaintiff's constitutional standing and thus did not call into question the court's subject-matter jurisdiction. *Id.*; *see also In re Bridgestone Ams. Tire Operations, LLC*, 459 S.W.3d 565, 573 (Tex. 2015) (orig. proceeding) (stating lack of capacity, unlike standing, is not a jurisdictional defect). The court concluded its analysis by noting that "[a]t this stage of the litigation, we need not inquire further into the assignment's impact on [the plaintiff's] claims." *McLane Champions*, 2023 WL 4306378, at *4; *see Pike*, 610 S.W.3d at 778 (stating that the statutory provisions limiting a stakeholder's ability to recover certain measures of damages go to the merits of the claim and "do not strip a court of

subject-matter jurisdiction to render a take-nothing judgment if the stakeholder fails to meet the statutory requirements").

Appellants complain that Newman lacks the legal authority to pursue some of her claims because the Texas Nonprofit Corporations Act "makes no provision for a derivative suit"[17] and that "by the time that Newman filed her life [sic] pleading, she was no longer a member." They refer us to *Tran v. Aloysius Duy-Hung Hoang*, 481 S.W.3d 313 (Tex. App.—Houston [1st Dist.] 2015, pet. denied), and *KIPP, Inc. v. Grant Me The Wisdom Foundation, Inc.*, 651 S.W.3d 530 (Tex. App.—Houston [14th Dist.] 2022, pet. denied), for the proposition that the statutes that authorize and govern nonprofits do not confer membership standing to sue on a nonprofit's behalf.

In *Tran*, the court noted that unless standing is conferred by statute, a plaintiff "must demonstrate that he or she possesses an interest in a conflict distinct from that of the general public, such that the defendant's actions have caused the plaintiff some particular injury," because standing focuses on whether a party has a justiciable interest in the suit's outcome. 481 S.W.3d at 316. The question in *Tran* was whether a member of a nonprofit had a justiciable interest in seeking redress on the organization's behalf when the organization had not otherwise conferred on that

---

[17]Appellants also argue that Title 2 of the Business Organizations Code "contains two separate chapters, one for governing for-profit corporations and the other governing nonprofit corporations." But Title 2 contains *four* separate chapters—one for for-profit corporations, one for nonprofit corporations, one for special-purpose corporations, and one for "general provisions," which includes ultra vires acts. *See generally* Tex. Bus. Orgs. Code Ann. §§ 20.001–23.110.

28

member a right to act on its behalf in its articles of incorporation and bylaws. *Id.* at 314, 316.

The dispute in *Tran* arose from internal tensions after the nonprofit raised funds to finance a new building. *Id.* at 315. The nonprofit's board of supervisors sued the board's individual members, purporting to bring a derivative suit on the nonprofit's behalf and seeking damages and declaratory relief for injuries they alleged the directors had caused the nonprofit. *Id.* at 314–15. They brought claims for breach of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, fraud, and negligence, *id.* at 315, but they did not bring an ultra vires claim. *See Carmichael v. Tarantino Props., Inc.*, 604 S.W.3d 469, 475 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (noting that the *Tran* plaintiffs "did not assert *ultra vires* claims on behalf of a nonprofit corporation, [so] the question of whether Chapter 20 conferred representative standing to bring such claims was neither presented nor addressed").

The *Tran* court observed that no statutory provision applicable to nonprofits paralleled the one that allowed for-profit shareholders to bring a derivative lawsuit and that nonprofit members were specifically excluded from the statutory definition of "shareholder." 481 S.W.3d at 317 (noting that "Chapter 22 . . . contains no authorization for a derivative suit brought on behalf of the nonprofit corporation"). The court stated that authority to sue on a nonprofit's behalf is a standing issue and that the member–plaintiffs had failed to assert an individual injury. *Id.* And because the Declaratory Judgments Act is a procedural device for deciding cases already within

29

the court's jurisdiction and does not confer jurisdiction where none already exists, the member–plaintiffs lacked standing for the remainder of their claims. *Id.* at 318.

In contrast to *Tran*, *KIPP* was a TCPA suit. 651 S.W.3d at 535. In that case, a collection of nonprofits—Grant Me The Wisdom Foundation, Inc. (GMTW); KIPP, Inc.; St. Luke's United Methodist Church of Houston; Legacy Community Health Services; and YMCA for Greater Houston—joined together to form Connect, a nonprofit, to develop a community center. *Id.* A dispute arose between two GMTW members and the other nonprofits, which withdrew from Connect and formed a new nonprofit to continue the project without GMTW. *Id.* at 535–36. GMTW then sued, individually and on behalf of Connect, the attorneys involved in setting up Connect for legal malpractice and the other nonprofits for a variety of claims, including fraud, breach of contract, tortious interference, breach and misapplication of fiduciary duty, and conspiracy. *Id.* at 536. The trial court dismissed the claims made on Connect's behalf for lack of standing, and Connect intervened to reassert those claims. *Id.* The defendants moved to dismiss all but Connect's fraud claim under the TCPA, and the trial court denied the motion. *Id.* at 536 & n.3.

On appeal, the court relied on *Tran* for the proposition that no statute confers derivative standing upon a nonprofit's members to sue on the nonprofit's behalf and that a nonprofit's members thus lack derivative standing "absent authority granted in a nonprofit's organizational documents." *Id.* at 543 (citing *Tran*, 481 S.W.3d at 316–

30

17). The court concluded that GMTW lacked standing to sue on Connect's behalf. *Id.*

As to the TCPA's applicability to Connect's claims, the appellants argued that the claims involved matters of public concern because they were based on communications and meetings aimed at removing one of GMTW's members from Connect's board, withdrawing from Connect, and creating a new entity without GMTW to pursue the community center's development. *Id.* at 537. The court concluded that the legal malpractice claims that were based on the lawyers' failures to act were not predicated on communications that would implicate free speech or collective action but that the allegation that they provided legal advice that was detrimental to Connect implicated the right of association.[18] *Id.* at 538–39.

The court held that Connect's remaining allegations were fairly considered a matter of public concern because they involved plans to build and fund a community center to serve an underserved community, "implicating the broader vision of the parties to improve the lives of area residents" beyond the pecuniary interests of the private parties involved. *Id.* at 540 ("In a nutshell, the nature of the dispute is over who has the right to make decisions regarding a project meant to benefit the community."). Without addressing whether Connect had showed a prima facie case

---

[18]In the latest round of TCPA amendments, effective September 1, 2023, the TCPA no longer applies to "a legal malpractice claim brought by a client or former client." *See* Act of May 25, 2023, 88th Leg., R.S., H.B. 527, §§ 1, 3 (to be codified as an amendment to Tex. Civ. Prac. & Rem. Code Ann. § 27.010).

to support its claims, the court concluded that the claims were barred by limitations and dismissed all but the fraud claim and the specifically enumerated malpractice claims that were not based on communications. *Id.* at 545–46.

Here, Newman alleged that she had standing as a Kickball member to bring her ultra vires claim under Business Organizations Code Section 20.002(c). Section 20.002 applies to for-profit *and* nonprofit corporations. *See* Tex. Bus. Orgs. Code Ann. § 20.002(c)(2) (stating that a member may bring a representative suit against an officer or director for exceeding authority in an act inconsistent with an expressed limitation on his or her authority). Newman further alleged that Appellants had "purported to remove" her membership and to "banish" her from participating in Kickball, a concrete and personalized injury caused by Appellants that could be redressed by a decision in Newman's favor. *See McLane Champions*, 2023 WL 4306378, at *3; *cf. Guadalupe Valley Elec. Co-op., Inc. v. S. Tex. Chamber of Com.*, 374 S.W.2d 329, 333 (Tex. App.—San Antonio 1963, no writ) ("This is not a case of expulsion of members, but merely a refusal to accept appellants' renewal of membership."). If Newman's membership was improperly revoked—as alleged—then she retained standing for her ultra vires claim. *See generally Carmichael*, 604 S.W.3d at 472, 475 (determining that plaintiff condominium owners had statutory standing under Section 20.002(c) to assert the nonprofit condominium association's ultra vires claim against the association's present or former officers or directors); *see also Pike*, 610 S.W.3d at 777 ("[W]hether a party can prove the merits of its claim or satisfy the requirements

32

of a particular statute does not affect the court's subject-matter jurisdiction."). And if Newman's membership was improperly revoked, then she also retained a right to examine and copy "for a proper purpose, the books and records of the corporation relevant to that purpose." Tex. Bus. Orgs. Code Ann. § 22.351 ("Member's Right to Inspect Books and Records"); *see also id.* § 22.353(b) (stating that a nonprofit corporation shall make records, books, and reports of its financial activity available to the public for inspection and copying).

Further, there is no showing that Kickball's bylaws prohibit a member's suing on the nonprofit's behalf (or, for that matter, how someone may lose her membership under the bylaws).[19] *Cf. Tran*, 481 S.W.3d at 314, 316; *Guadalupe Valley*, 374 S.W.2d at 333 ("The trial court properly held that appellants' membership renewals were validly and legally rejected, because the by-laws amendment, which specifically authorized such action, was valid and did not defeat or impair any vested right of appellants."); *Manning v. San Antonio Club*, 63 Tex. 166, 171 (1884) ("Appellant does not pretend that, in his expulsion, the board of directors violated in any way the by-laws of the club."). Kickball's articles of incorporation, which were attached by the Original Defendants to their amended TCPA motion, do not address whether a member may bring a lawsuit on the nonprofit's behalf. *Cf. Tran*, 481 S.W.3d at 314, 316.

---

[19]The May 4, 2022 group email addresses "Article VI, Section 4" of the bylaws, demonstrating that there is more to the bylaws than the single page attached by the Original Defendants to their amended TCPA motion.

To establish Appellants' liability, Newman will eventually have to prove that they did not act in good faith, with ordinary care, in the manner that they reasonably believed to be in Kickball's best interest, and without reliance on the written opinion of an attorney for Kickball. *See* Tex. Bus. Orgs. Code Ann. §§ 22.221(b), .228, .235. At this stage of the litigation, however, her pleadings sufficiently allege that Appellants have not acted in good faith, that they have acted without ordinary care, and that they have acted without a reasonable belief in Kickball's best interest but rather for their own personal interests. Because Newman's pleadings contain sufficient allegations to support her claims on behalf of Kickball and for her own concrete, personalized injuries, she sufficiently alleged standing, and we overrule this portion of Appellants' sole issue.

## B. TCPA burden-shifting framework

Under the TCPA, the first step in the statutory burden-shifting analysis is for the movant to show that the lawsuit is "based on or is in response to" the movant's exercise of the right of free speech, right to petition, or right of association[20] "or arises from any act of that party in furtherance of the party's communication or conduct

---

[20]Because Appellants moved for dismissal only as to free speech and association, we will not address the right to petition.

described by Section 27.010(b)."[21]  Tex. Civ. Prac. & Rem. Code Ann. § 27.003(a); *see also id.* § 27.005(b).

The TCPA defines "exercise of the right of association" to mean "to join together to collectively express, promote, pursue, or defend common interests relating to a governmental proceeding or a matter of public concern."  *Id.* § 27.001(2); Amy Bresnen et al., *Targeting the Texas Citizen Participation Act: The 2019 Texas Legislature's Amendments to A Most Consequential Law*, 52 St. Mary's L.J. 53, 71 (2020) (noting that "[c]ollectively, by including the elements of public participation in government and expression regarding matters of public concern, the [2019 TCPA] amendments to the definition of the right of association moved the focus of the TCPA much closer to its stated purpose: the protection of *constitutional* rights").[22]  The TCPA defines "exercise of the right of free speech" to mean a "communication made in connection with a matter of public concern."  Tex. Civ. Prac. & Rem. Code Ann. § 27.001(3).  The

---

[21]No party argues that Section 27.010(b) applies.  *See* Mark C. Walker, *Reputational Torts and the Texas Anti-SLAPP Law: The Essential Guide with Updates on the Texas Defamation Mitigation Act*, 99 The Advoc. (Tex.) 4, 36 (2022) (noting that the Legislature added subsection (b)(1) in the 2019 TCPA "to help overcome media interest opposition to any changes to the TCPA").

[22]One of our sister courts has noted that the "tightening of the statutory language" in the 2019 TCPA restricted and narrowed the TCPA's protection, and the deletion of "relates to" in the "exercise of the right of association" removed the broadest category of connection, "thereby requiring future TCPA movants to establish a closer nexus between the claims against them and the communications they point to as their exercise of protected rights."  *Rivas v. Lake Shore Harbour Cmty. Ass'n*, No. 01-22-00121-CV, 2023 WL 3063409, at *11 (Tex. App.—Houston [1st Dist.] Apr. 25, 2023, no pet.) (mem. op.).

TCPA defines "communication" to include the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic.[23] *Id.* § 27.001(1).

A "matter of public concern" for TCPA purposes is "a statement or activity regarding: (A) a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity; (B) a matter of political, social, or other interest to the community; or (C) a subject of concern to the public." *Id.* § 27.001(7); *see* Bresnan, 52 St. Mary's L.J. at 94 (noting that although the new definition of "matter of public concern" could be criticized as circular, "the Legislature carefully chose unmistakable language from mainstream jurisprudence to emphasize that, going forward, it is the 'public' interest in a communication that will drive the applicability of the TCPA"); *see also Brady v. Klentzman*, 515 S.W.3d 878, 884 (Tex. 2017) (defining "matter of public concern" in defamation context).

---

[23]As for communications, Appellants direct us to the portion of Newman's amended petition that references "false accusations" and "clandestine meetings" and to Newman's messages that Hiatt attached to her TCPA motion, which "reference accusations." Newman responds that none of her claims relate to, indirectly or directly, Appellants' specific comments or communications; rather, she states that her lawsuit relates to their unlawful conduct and that the TCPA "does not apply to the internal political disputes of a private business." *See McLane Champions*, 2023 WL 4306378, at *1 (holding TCPA did not apply to a dispute between private parties to a private business transaction that later generated public interest). She asserts that she filed the lawsuit not to "silence the criticism of the Defendants" but rather because of their unlawful conduct.

Public matters may include a subject of legitimate news interest such as the commission of a crime, its subsequent prosecution, and the judicial proceedings arising therefrom; the disclosure of a public official's misbehavior; or another subject of general interest and of value and concern to the public. *See Brady*, 515 S.W.3d at 884 (noting that there is a paramount public interest in a free flow of information to the people concerning public officials). In considering the content, form, and context of whether speech is of public or private concern, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said. *Snyder v. Phelps*, 562 U.S. 443, 454, 131 S. Ct. 1207, 1216 (2011).

If a TCPA movant satisfies its burden to show that the legal action falls under the TCPA, then to avoid dismissal, the nonmovant must establish by clear and specific evidence a prima facie case for each essential element of the claim in question. Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b)–(c); *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018) ("We begin our inquiry with the threshold question of whether the [TCPA] applies to the case before us.").

In determining whether a legal action is subject to or should be dismissed under the TCPA, the trial court may consider the pleadings, affidavits, and evidence permitted in the summary-judgment context. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.006(a); *Kadow v. Grauerholz*, No. 02-20-00044-CV, 2021 WL 733302, at *2 (Tex. App.—Fort Worth Feb. 25, 2021, no pet.) (mem. op.). The nonmovant's pleadings

are the "best and all-sufficient" evidence of the nature of its claims against the party seeking a TCPA dismissal. *Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017); *Avid Square Constr., LLC v. Valcon Consulting, LLC*, No. 02-22-00297-CV, 2023 WL 3113950, at *4 (Tex. App.—Fort Worth Apr. 27, 2023, no pet.) (mem. op.). We view the pleadings in the light most favorable to the nonmovant, favoring the conclusion that the claims are not predicated on protected expression, and we disregard as irrelevant any factual allegations that are not a factual predicate for the claims. *Newstream Hotels & Resorts, LLC v. Abdou*, No. 02-21-00343-CV, 2022 WL 1496537, at *2 (Tex. App.—Fort Worth May 12, 2022, pet. denied) (mem. op.).

We review de novo whether the TCPA applies. *USA Lending Grp., Inc. v. Winstead PC*, 669 S.W.3d 195, 200 (Tex. 2023). And while the Legislature has directed that the TCPA "shall be construed liberally to effectuate its purpose and intent fully," it has also stated that the TCPA "does not abrogate or lessen any other defense, remedy, immunity, or privilege available under other constitutional, statutory, case, or common law or rule provisions." Tex. Civ. Prac. & Rem. Code Ann. § 27.011.

Dismissal under the TCPA is determined on a claim-by-claim basis. *TSA-Tex. Surgical Assocs., L.L.P. v. Vargas*, No. 14-19-00135-CV, 2021 WL 729862, at *2 (Tex. App.—Houston [14th Dist.] Feb. 25, 2021, no pet.) (mem. op.). If a legal action relates to both protected and unprotected activity under the TCPA, the claim is subject to dismissal only to the extent that it is in response to the protected conduct. *Marshall v. Marshall*, Nos. 14-18-00094-CV, 14-18-00095-CV, 2021 WL 208459, at *7

38

(Tex. App.—Houston [14th Dist.] Jan. 21, 2021, pet. denied) (mem. op.). If a TCPA movant does not provide guidance as to how to determine which claims are in response to protected rather than unprotected conduct, and the court is unable to identify a means to accomplish the task, the trial court does not err by denying the motion. *Id.*

## C. Application

Appellants argue that "all of [Newman's] claims are based on [A]ppellant[s'] communications among themselves, to other [Kickball] members and to the public about the election of [Kickball] board members and [A]ppellants' conduct as board members." Apparently referencing *KIPP, Inc.*, they argue, "Just as a community center concerns the public and local community, the operation of a nonprofit community youth sports league operating as a public-private partnership with the City of Watauga is a matter of public concern. The TCPA applies."

As a general matter, while Kickball's first and second elections are central to Newman's complaints about Appellants' actions, the record reflects that the parties' election-based disputes relate to internal Kickball matters unlikely to affect (or interest) the general public. *Cf. Conrad v. Joiner*, No. 01-22-00450-CV, 2023 WL 4356187, at *3–4 (Tex. App.—Houston [1st Dist.] July 6, 2023, no pet. h.) (mem. op.) (holding TCPA applied to defamation suit in which movant made statements on Facebook and in emails sent to city council members about nonmovant mayor's alleged legal violations); *O'Rourke v. Warren*, No. 03-22-00416-CV, 2023 WL 3914278,

39

at \*7–8 (Tex. App.—Austin June 9, 2023, pet. filed) (holding TCPA applied to movant's allegedly defamatory tweets made about nonmovant during gubernatorial campaign); *Hadimani v. Hiremath*, No. 14-22-00002-CV, 2023 WL 3596248, at \*6 (Tex. App.—Houston [14th Dist.] May 23, 2023, no pet.) (mem. op.) (holding TCPA applied to defamation claims based on criminal allegations involving a social, cultural, and religious organization's internal management). Violating a bylaw is generally not a crime. *See State ex rel. Best v. Harper*, 562 S.W.3d 1, 14 (Tex. 2018) (explaining that violating an organization's internal rules may expose the violator to liability but such rules are not legal prohibitions against unlawful conduct). And communications are not the gravamen of Newman's complaints; instead, as Newman points out, her allegations involve Appellants' actions and omissions and are "not focused on the hateful or untrue content of [Appellants'] speech, but rather [on] the[ir] intentional conduct . . . in removing [her] and depriving her of her vested rights and interests as a director and a member" of Kickball. Applying these rationales, we address the application of the TCPA to Newman's claims in turn.

### 1. Remedies and other non-TCPA claims

Appellants attempt to characterize Newman's requests for exemplary and mental-anguish damages as claims subject to the TCPA. *But see* Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (setting out exemplary-damages criteria); *SCI Tex. Funeral Servs., Inc. v. Nelson*, 540 S.W.3d 539, 546 (Tex. 2018) (stating that mental-anguish damages may be available when they are caused by a defendant's breach of a legal

40

duty); *Douglas v. Delp*, 987 S.W.2d 879, 885 (Tex. 1999) (holding a plaintiff may not recover mental-anguish damages as a consequence of economic loss but expressing "no opinion on what standard may be appropriate when additional or other kinds of loss are claimed or when heightened culpability is alleged").

We have previously noted that "[t]he TCPA provides for dismissal of actions, not remedies" and that when a legal action is dismissed under the TCPA, "all remedies available under that legal theory disappear with the dismissal of the action itself." *Van Der Linden v. Khan*, 535 S.W.3d 179, 203 (Tex. App.—Fort Worth 2017, pet. denied). Because we must view Newman's pleadings in the light most favorable to her, and because Appellants could have filed—but did not file—special exceptions to force Newman to clarify whether she merely sought additional damages or whether she intended to bring a separate claim for intentional infliction of emotional distress,[24] we will not treat these requests for remedies as causes of action to be reviewed under the TCPA. *See* Tex. R. Civ. P. 91; *Brumley v. McDuff*, 616 S.W.3d 826, 831 (Tex. 2021) ("The proper response to a legally or factually infirm pleading is to file special exceptions objecting to the pleading."); *see also Frontier NanoSystems, LLC v. Cleveland Terrazas PLLC*, No. 08-22-00136-CV, 2023 WL 3737118, at *3 (Tex. App.—El Paso

---

[24]At the TCPA hearing, Hiatt's attorney noted that Newman had added to her amended petition what he thought might be a claim for intentional infliction of emotional distress, stating, "Here they brought in for the first time on their amended petition . . . what I think is an infliction -- an intentional infliction of emotional distress."

May 31, 2023, pet. filed) (mem. op.) ("Courts liberally construe petitions in favor of the pleader in the absence of special exceptions.").

Appellants also address Newman's request for "inspection of books and records, accounting, and disgorgement" as a cause of action,[25] but only part of this is a cause of action; a request for disgorgement seeks an equitable remedy for breach of fiduciary duty. *See Hsin-Chi-Su v. Vantage Drilling Co.*, 474 S.W.3d 284, 298 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). Further, the subject matter of the causes of action under Sections 22.351 and 22.353—a nonprofit member's right to inspect books and records and the availability of a nonprofit's financial information for public inspection, respectively—does not fall within the TCPA's purview. *See Dolcefino v. Cypress Creek EMS*, 540 S.W.3d 194, 200 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (noting, under predecessor TCPA statute, that there must be a connection between the claims in a lawsuit under Section 22.253 and the alleged protected conduct under the TCPA); *see also* Tex. Bus. Orgs. Code Ann. §§ 22.351, .353; *Watson v. Homeowners Ass'n of Heritage Ranch, Inc.*, 346 S.W.3d 258, 260 (Tex. App.—Dallas 2011, no pet.) (describing mandamus procedure in trial court to obtain inspection of association's books and records). Nor does an accounting. *See Yeske v. Piazza Del Arte, Inc.*, 513 S.W.3d 652, 674 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (explaining that an accounting may be either a particular remedy sought in

---

[25]Newman listed "inspection of books and records, accounting and disgorgement" in the "causes of action" section of her amended petition.

42

conjunction with another cause of action or it may be a suit in equity requiring that the right to an accounting must first be determined). The trial court did not err by failing to grant a TCPA dismissal on allegations that do not fall within the TCPA's ambit.

## 2. Potential TCPA claims

Newman sought eight declarations and other relief based on Appellants' alleged ultra vires acts, breaches of fiduciary duty, negligence, and civil conspiracy.

### a. Declaratory-judgment requests

As set out in our factual recitation, Newman sought eight declarations under the Declaratory Judgments Act, but she did not allege the occurrence of any communications as to these declaratory-judgment requests. *See Smith v. Crestview NuV, LLC*, 565 S.W.3d 793, 798 (Tex. App.—Fort Worth 2018, pet. denied) ("[T]he TCPA's protections extend to all forms of *communication*."). Instead, her claims are based on Appellants' conduct. In *Smith*, we noted that the nonmovant had specifically and narrowly alleged that the movant's *actions* aided violation of the Texas Securities Act, not the movant's *communications*, and that none of the allegations leveled against the movant referred to his communications with his co-defendant: Smith "rendered substantial assistance in furtherance of Armstrong's conduct," "conduct[ed] clandestine 'testing,'" "failed to keep any medical records," and "violated . . . Texas Medical Board regulations in connection with his assistance of Armstrong's sales." *Id.*; *cf. Phuong Nguyen v. ABLe Commc'ns, Inc.*, No. 02-19-00069-CV, 2020 WL 2071757,

at *5, *12 (Tex. App.—Fort Worth Apr. 30, 2020, no pet.) (mem. op.) (holding TCPA applied when nonmovant alleged that movant had breached its fiduciary duty by "disclosing" trade secrets, "soliciting" nonmovant's customers and employees, and "ma[king] communications about [nonmovant's] work" on local governmental entity contracts).

And although Newman's request for a declaration of the election results' finality implies a communication—i.e., that Appellants must have declared that the June 4, 2022 election results were *not* final—as we stated in *Newstream*,

> [M]erely alleging conduct that has a communication embedded within it does not create the relationship between the claim and the communication necessary to invoke the TCPA. *See Smith* . . . , 565 S.W.3d [at] 798 . . . ; *see also Shopoff Advisors, L.P. v. Atrium Circle, GP*, No. 04-20-00310-CV, 2021 WL 2669337, at *4 (Tex. App.—San Antonio June 30, 2021, no pet.) (mem. op.) (filing of lis pendens did not invoke the protection of the TCPA, gravamen of the case was the failure to release the lis pendens in accordance with arbitration award); *Pacheco v. Rodriguez*, 600 S.W.3d 401, 410 (Tex. App.—El Paso 2020, no pet.) ("[W]hen a claim does not allege a communication, and is instead based on a defendant's conduct, the TCPA is not implicated."); *Riggs & Ray, P.C. v. State Fair of Tex.*, No. 05-17-00973-CV, 2019 WL 4200009, at *4 (Tex. App.—Dallas Sept. 5, 2019, pet. denied) (mem. op.) ("Although SFT communicated this noncompliance through its declaratory[-]judgment suit, the noncompliance itself, not the communication, is the basis of R & R's claims."); *Allied Orion Grp., LLC v. Pitre*, No. 14-19-00681-CV, 2021 WL 2154065, at *3 (Tex. App.— Houston [14th Dist.] May 27, 2021, no pet.) (mem. op.) (recognizing that while communications may have occurred as part of the process leading up to the plaintiff's employment termination, the plaintiff's termination suit did not assert claims based upon the making or submitting of any statement or document and therefore claims were not subject to the TCPA).

2022 WL 1496537, at *2.

Further, the TCPA does not apply to a claim for *failure* to disclose information because such a claim is not based on or in response to the making of a "communication," i.e., "the making or submitting of a statement or document," *Phuong Nguyen*, 2020 WL 2071757, at *20 (referencing Section 27.001(1)); *see Rivas*, 2023 WL 3063409, at *8 (concluding that claims against board member were not based on or in response to his protected communications but rather on his alleged failure to disclose). And a nonprofit's books and records—other than financial information—generally are not created for communication to the public. *Compare* Tex. Bus. Orgs. Code Ann. § 22.351 (stating that a nonprofit corporation's *member* "on written demand stating the purpose of the demand, is entitled to examine and copy at the member's expense . . . at any reasonable time and for a proper purpose, the books and records of the corporation relevant to that purpose"), *with id.* § 22.253(b) (stating that a nonprofit shall make the records, books, and annual reports of its financial activity available to the public for inspection and copying). Based on the lack of alleged "communications" and failures to act, none of the requested declarations pertain to Appellants' right of free speech.

The TCPA's definition of the "exercise of the right of association" no longer expressly requires a "communication" between the individuals who "join together to collectively express, promote, pursue, or defend common interests relating to a . . . matter of public concern," *cf.* Act of May 21, 2011, 82d Leg., R.S., ch. 341, § 2, 2011 Tex. Gen. Laws 961, 961–62 (amended 2019), and the addition of "matter of public

45

concern" to the definition requires "a statement or activity." Tex. Civ. Prac. & Rem. Code Ann. § 27.001(2), (7). As noted above, Newman did not allege the occurrence of any statements as to these declaratory-judgment claims. Therefore, unless Newman's claim involved Appellants' joining together to collectively express, promote, pursue, or defend a *common* interest related to an activity regarding a matter of interest to the community or a subject of concern to the public, none of these claims are governed by the TCPA.[26] *See id.*

Interpreting the pre-2019 TCPA in *Kawcak v. Antero Resources Corp.*, we determined that the use of "common" implies more than just the narrow selfish interests of persons who act jointly to commit a tort. 582 S.W.3d 566, 569 (Tex. App.—Fort Worth 2019, pet. denied); *see Sanchez v. Striever*, 614 S.W.3d 233, 244 (Tex.

---

[26]Appellants reference their 1991–2000 *Star-Telegram* articles to support their argument that Kickball's activities and programs "have long been the subject of news reports." But these articles, published before Kickball's incorporation, reflect a lack of public coverage and concern about Kickball's internal disputes in 2022. Appellants also reference their "partnership" with the City of Watauga, but Chavez merely stated in her unsworn declaration that the City leased the ball fields in the public park to Kickball, while Newman stated in her unsworn declaration that the lease was just an agreement to use the ball fields in exchange for monetary consideration but no other mutuality of interest. No one included a copy of the lease as an exhibit, and the mere existence of a lease with a public entity does not appear to implicate a matter of public concern under the current TCPA without claims by the plaintiff that involve the lease and a showing that those claims are subject to the TCPA. *See, e.g.*, *Jetall Cos. v. Sonder USA Inc.*, No. 01-21-00378-CV, 2022 WL 17684340, at *18 (Tex. App.—Houston [1st Dist.] Dec. 15, 2022, no pet.) (mem. op. on reh'g) (holding TCPA did not apply to nonmovant's declaratory-judgment claim to determine rights, status, and other legal relations under commercial property leases when nothing in the claim sought to limit the movants' rights of free speech or petition). None of Newman's claims involve the lease.

App.—Houston [14th Dist.] 2020, no pet.) ("Put simply, there is no constitutional right to engage in criminal behavior or commit civil wrongs."). And as the supreme court recently observed in *McLane Champions*,

> Taken together, [*Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509–10 (Tex. 2015), *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 897–901 (Tex. 2017), and *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 136–37 (Tex. 2019),] demonstrate that communications that are merely "related somehow to one of the broad categories" set out in the statute but that otherwise have no relevance to a public audience are not "communications made in connection with a matter of public concern." [*Creative Oil*, 591 S.W.3d at 137]; *see Goldberg v. EMR (USA Holdings) Inc.*, 594 S.W.3d 818, 828 (Tex. App.—Dallas 2020, pet. denied) (citing *Creative Oil* and noting that "the communications *themselves* must relate to a matter of public concern" (emphasis added)). To be sure, private communications can implicate the right of free speech under the TCPA, but in both *Lippincott* and *Coleman* the communications at issue, while made privately, held some relevance to a public audience when they were made. *See Lippincott*, 462 S.W.3d at 509–10; *Coleman*, 512 S.W.3d at 898.

> Construing the TCPA to cover communications that hold some relevance to a public audience when they are made is also more consistent with the ordinary meaning of the phrase "in connection with." The TCPA does not define that phrase. Merriam-Webster, however, defines it as an idiomatic expression meaning "for reasons that relate to (something)." *In connection with*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/in%20 connection%20with (last visited June 28, 2023). The definition indicates the two connected things are relevant to each other and provides an example that fleshes this idea out: "Police arrested four men *in connection with* the robbery." *Id.* The arrest has some relevance to "the robbery," not the crime of robbery in the abstract.

2023 WL 4306378, at *6. The supreme court referenced our *Kawcak* "common interest" definition in a footnote before noting that "[t]he 2019 amendments to the TCPA . . . have resolved [the 'common interest'] split for future cases by redefining

47

the exercise of the right of association to clarify that the common interest parties join together to collectively express, promote, pursue, or defend must relate to a governmental proceeding or a matter of public concern." *Id.* at *9 & n.11.

Except for the declaration purporting to exonerate Newman, because the requested declarations allege activities made in the narrow, selfish interests of the alleged tortfeasors' common interest rather than in furtherance of an interest common to the kickball community, we conclude that these claims do not fall under the TCPA. *Cf. O'Hern v. Mughrabi*, 579 S.W.3d 594, 603 (Tex. App.—Houston [14th Dist.] 2019, no pet.).[27] And as to the declaration purporting to exonerate Newman under

---

[27]In *O'Hern*, the common interest belonged to condominium owners who were not the alleged tortfeasors. A condominium association board member sued the other four board members for breach of fiduciary duty in their official capacity after the board decided to levy a $5.9-million special assessment to replace the external windows of the seventeen-story condominium building. 579 S.W.3d at 597–98, 602. The plaintiff alleged that the defendants owed him a fiduciary duty and had breached that duty by taking, or failing to take, certain actions as board members. *Id.* at 602–03. The defendants filed a TCPA motion based on their right of association and their communications that included oral remarks at board meetings, written presentations, and notices of decisions in pursuit or defense of the common interest in providing the management, maintenance, repair, and replacement of the condominium's common elements. *Id.* at 603. In analyzing *O'Hern*, the Amarillo court noted that "the cases cited within *O'Hern* also identify that a claim for breach of fiduciary duty is covered by the TCPA only where there is a public or quasi-public board or group involved and their communications relate to a public interest." *Tex. Custom Wine Works, LLC v. Talcott*, 598 S.W.3d 380, 387 (Tex. App.—Amarillo 2020, no pet.).

The case before us is more like cases brought by former association members as to suspension of their membership rights or expulsion. *Compare Williams v. Smith*, No. 02-21-00415-CV, 2022 WL 17841135, at *1 (Tex. App.—Fort Worth Dec. 22, 2022, no pet.) (mem. op.) (noting that a temporary loss of fraternity membership rights, standing alone, is generally not the type of property loss for which courts will

48

LMKII's and Kickball's rules, Newman had a right to seek protection under the Declaratory Judgments Act as to her own conduct. *See Gilani v. Rigney*, No. 02-21-00314-CV, 2022 WL 714700, at \*4 (Tex. App.—Fort Worth Mar. 10, 2022, pet. denied) (mem. op.) (stating that the TCPA does not create a right for a TCPA movant to usurp the Declaratory Judgment Act's protections).[28] We overrule this portion of Appellants' sole issue. *See Smith*, 565 S.W.3d at 798; *cf. Phuong Nguyen*, 2020 WL 2071757, at \*5, \*12.

### b. Ultra vires

Newman's ultra vires claim lists a variety of non-speech-related activities that do not fall under the TCPA, such as violating Chapter 22 of the Texas Business Organizations Code and changing the association's membership and voting-eligibility

interfere in a voluntary organization's operations), *with Int'l Printing Pressmen & Assistants' Union of N. Am. v. Smith*, 198 S.W.2d 729, 732 (Tex. 1946) (reversing expulsion from union when union failed to follow its expulsion rules), *and Collins v. Kappa Sigma Fraternity*, No. 02-14-00294-CV, 2017 WL 218286, at \*9–10 (Tex. App.—Fort Worth Jan. 19, 2017, pet. denied) (mem. op.) (noting, in summary-judgment appeal, that appellant provided evidence in support of his due-process claim that executive committee members who expelled him had longstanding grievances against him, that other fraternity members had not been expelled for conduct like his, and that the committee purposely held its expulsion trial when he could not attend).

[28]Newman refers us to *Choudhri v. Lee*, No. 01-20-00098-CV, 2020 WL 4689204, at \*3 (Tex. App.—Houston [1st Dist.] Aug. 13, 2020, pet. denied) (mem. op.), for the proposition that a declaratory-judgment claim is generally not subject to the TCPA. But *Choudhri* is not that broad, *see id.* at \*1–3, and the TCPA specifically defines "legal action" to include a filing that requests declaratory relief. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.001(6); *Gilani*, 2022 WL 714700, at \*5 n.5; *see also* Walker, 99 The Advoc. (Tex.) at 19 ("Under the 2019 [TCPA], there is some authority that a claim for declaratory relief under the UDJA is a 'legal action' subject to dismissal under the TCPA if such a claim implicates a protected right.").

49

rules to maintain board positions contrary to voting results. *See Smith*, 565 S.W.3d at 798. Taking Newman's pleadings as true, these items and her remaining items that implicate speech, such as illegally conducting meetings in violation of the bylaws and conspiracy, are all unprotected activities by tortfeasors because they were not taken in the "common" interest of the kickball community, but rather despite it. *See Kawcak*, 582 S.W.3d at 569. We overrule this portion of Appellants' sole issue.

### c. Breach of fiduciary duty

In one of her breach-of-fiduciary-duty claims, Newman alleged that Appellants had breached their fiduciary duties "of obedience, loyalty, and due care" to Kickball, referencing Appellants' "personal vendetta" against her, their actions to remove her as a member and director, their using "special one-time" bylaws to invalidate the election and exclude her from the new election, as well as Appellants' failing and refusing to deliver membership lists to her. *See* Jody S. Sanders & David E. Keltner, *Fiduciary Duties: Navigating Contract and Common-Law Limits*, 40 Corp. Couns. Rev. 1, 15 (2021) (noting that fiduciary-duty claims are not expressly exempted under the TCPA despite the Legislature's tightening of TCPA's remedies and definitions for lawsuits filed on or after September 1, 2019). To the extent that Newman's general breach-of-fiduciary-duty allegations imply communications (i.e., "false accusations") or an activity, they are insufficient to support a "common" interest that would shield Appellants under the TCPA. *See Kawcak*, 582 S.W.3d at 569.

As to her separate breach-of-fiduciary-duty claim as to Perales—the hotel-reward points, the no-bid photography services, and the conspiracy to allow Perales to personally profit at the membership's expense—while Perales's alleged refusal, upon request, to allow other members to receive their own hotel points, involved the making of a "communication," *see* Tex. Civ. Prac. & Rem. Code Ann. § 27.001(1), it did not involve a matter of *public* concern, *cf. id.* § 27.001(7)(C). And the alleged conspiracy to allow Perales to profit from no-bid photography services is not an interest that the TCPA protects because the "common" interest here is "tortfeasors breaching fiduciary duties and working together for their own personal benefit rather than an interest common to the public or a larger group." *Farhat v. Wilson Scott, LLC*, No. 02-19-00438-CV, 2020 WL 1949624, at *3 (Tex. App.—Fort Worth Apr. 23, 2020, no pet.) (mem. op.); *see Kawcak*, 582 S.W.3d at 588 ("[T]he plain meaning of the word 'common' in TCPA [S]ection 27.001(2)'s definition of 'the right of association' requires more than two tortfeasors conspiring to act tortiously for their own selfish benefit."). Because the TCPA does not apply to either of these claims, we overrule this portion of Appellants' sole issue.

### d. Negligence

With regard to Newman's negligence allegations, as discussed above, allegations of a failure to communicate do not fall under the TCPA, *see Phuong Nguyen*, 2020 WL 2071757, at *20, nor do allegations of actions that are unrelated to communications, *see Smith*, 565 S.W.3d at 798, or actions related to tortfeasors' associating together to

act tortiously for their own selfish benefit, *see Kawcak*, 582 S.W.3d at 588. Accordingly, we conclude that Newman's negligence allegations likewise do not fall under the TCPA, and we overrule this portion of Appellants' sole issue. *Compare Pacheco*, 600 S.W.3d at 410 (concluding that negligence allegation, e.g., "failing to maintain their fence," was based solely on conduct and not communications, preventing TCPA's application), *with Cunningham v. Waymire*, 612 S.W.3d 47, 56–59 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (concluding claims for, among other things, negligence, were governed by TCPA based on grandparent's alleged written and verbal threats and statements).

### e. Civil conspiracy

In her civil-conspiracy claim, Newman alleged that Appellants either accomplished an unlawful purpose by disregarding the bylaws and the election results or accomplished a lawful purpose of voting in a new board of directors by unlawful means "in derogation of their fiduciary duties." But civil conspiracy requires an underlying intentional tort that has caused damages. *See Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019). The underlying intentional torts listed in Newman's amended petition are breach of fiduciary duty and fraud. Because fraud is not a basis for a TCPA dismissal, and because Newman's fiduciary-duty allegations do not support dismissal under the TCPA, her civil-conspiracy claim can likewise not be dismissed under the TCPA. *See Mignogna v. Funimation Prods., LLC*, No. 02-19-00394-CV, 2022 WL 3486234, at \*15 (Tex. App.—Fort Worth Aug. 18, 2022, pet. denied)

52

(mem. op.) ("A conspiracy claim is a derivative tort because recovery is not based on the conspiracy but on an underlying tort."). We overrule this portion of Appellants' sole issue.

### 3. Conclusion

We have concluded that the TCPA does not apply to Newman's claims. Appellants' having failed to meet the TCPA's threshold requirement, the burden never shifted to Newman to produce evidence to support her claims. Accordingly, we do not need to reach the remainder of Appellants' arguments to determine that the trial court did not err by allowing Appellants' TCPA motions to be overruled by operation of law. *See* Tex. R. App. P. 47.1.

### IV. Conclusion

Having overruled the dispositive portions of Appellants' sole issue, we affirm the denial of Appellants' TCPA motions.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: August 31, 2023